Raymond Eugene GREEN, Appellant,

v.

Ben REYES, Appellee.

No. B14–92–00680–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 30, 1992.

**204**

Eugene Jones, Houston, Randall B. Wood, Austin, Jack C. Ogg, Houston, for appellant.

William H. White, Gerald M. Birnberg, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and CANNON, JJ.

## OPINION

PER CURIAM.

This is an accelerated appeal in an election contest. Appellant, Raymond Eugene Green, appeals from the trial court order of a new election in the Democratic nomination for United States Representative to the 29th Congressional District. In eighteen points of error, appellant asserts that the trial court abused its discretion by declaring the election canvass void and ordering a new election. We affirm.

Appellee, Ben Reyes, brought an election contest pursuant to section 232 of the Election Code challenging the final canvass as not reflecting the true outcome of the election. *See* TEX.ELEC.CODE ANN. § 232.001 *et seq.* (Vernon 1986). Both appellee, Ben Reyes, and appellant, Raymond Eugene Green, were candidates in the Democratic primary runoff election for Democratic party nominee to the 29th Congressional District. The April 14, 1992 election primary runoff yielded a 180 vote margin of victory for appellant. Appellee's election contest petition argued that a significant number of voters had cast votes in both the Republican primary contest on March 10, 1992 and subsequently participated in the April 14, 1992 Democratic primary runoff. Under the Texas Election Code, the ballot of voters who cast ballots in both the Republican and Democratic primary elections are void. *See* TEX.ELEC.CODE ANN. § 162.013 (Vernon 1986). Therefore, such ballots are illegal votes and not legally countable. *See* TEX.ELEC.CODE ANN. § 221.003 (Vernon 1986). Appellee provided a list of 431 names and addresses of the illegal crossover voters which had been compiled by the accounting firm of Arthur Andersen & Company. The company had compiled the list through a detailed comparison of voter names, voter registration numbers and precinct numbers. The list included the names of only those voters who had voted in both the March 10, 1992 Republican Primary and the April 14, 1992 Democratic Primary runoff.

During an eleven day trial, the court heard testimony from 313 of the 431 allegedly illegal voters. Many of the vot-

ers appeared at trial to testify; a few were deposed by telephone; and some others submitted affidavits. Many witnesses expressed dismay and anger that the trial court was demanding that they reveal for whom they had voted when generally voters enjoy a constitutional right not to do so; however, the trial court properly advised the voters that this protection does not extend to voters who have cast illegal votes. *See, e.g., Ex Parte Henry,* 132 Tex. 575, 126 S.W.2d 1 (1939). *See also* TEX. ELEC.CODE ANN. § 221.009(a) (Vernon 1986). Nevertheless, the trial court issued admonishments to each witness that although voting in both political party's election primary is a crime, "nothing you testify to in this case can ever be used against you." The court determined that the number of illegal votes was truly 429 and that of those votes, 220 illegal votes were cast in favor of Green, 75 illegal votes in favor of Reyes, 8 votes were not illegal at all [1], and 126 votes were unable to be attributed to either candidate because the testimony of the voter was unable to be obtained or the voter did not remember how he or she voted. Thereafter, both appellant and appellee brought forth expert testimony to show that statistically the vast majority of the 126 undetermined illegal votes would have been cast for their opponent.

After deducting the number of attributable illegal votes from each side, Green maintained a 41 vote margin of victory. Once the trial court has determined which illegal votes it can subtract as attributable to either candidate and which illegal votes are unascertained, section 221.012 provides that:

(a) If the tribunal hearing an election contest can ascertain the true outcome of the election, the tribunal shall declare the outcome.

(b) The tribunal shall declare the election void if it cannot ascertain the true outcome of the election.

TEX.ELEC.CODE ANN. § 221.012 (Vernon 1986). The trial court exercised its authority under the election code and ordered the election void because the margin of victory was less than the number of unascertained illegal votes. TEX.ELEC.CODE ANN. § 221.-009(b) (Vernon 1986).

In support of this ruling, the trial court issued its Findings of Fact and Conclusions of Law as follows:

### A. Findings of Fact

1. On April 14, 1992, the Democratic Party of Harris County held a primary run-off election to determine the party's nominee for the newly created 29th Congressional District. The two men running for that election were Ben Reyes, a long-time Houston city councilman, and Raymond Eugene Green, a state senator from the Houston area. The final canvass of the April 14 run-off election showed that Green had won by a 180 vote margin. The April 14 runoff followed a March 10, 1992 general primary, held in both major political parties. Pursuant to a stipulation made by the two parties the final canvass of the election reflected the following totals for each of the candidates: Raymond Eugene Green— 15,844 votes; Ben Reyes—15,664 votes.

2. After Reyes had filed this lawsuit, but before the trial had commenced, the Harris County Clerk, Anita Rodeheaver, discovered 22 unopened and uncounted ballots from the Democratic run-off. The ballots were later opened under the supervision of the court and found to reflect the following totals for each of the candidates: Raymond Eugene Green 14 votes, and Ben Reyes 8 votes. When added to the vote count stipulated to by the parties, the court finds that the final canvas should be adjusted to represent the following totals for each of the candidates: Raymond Eugene Green—15,858 votes; Ben Reyes—15,672 votes. This produces a margin of victory for Green of 186 votes.

3. Voting records kept by the Harris County Clerk's office showed that 431 individuals had signed-in to vote at the Republican primary on March 10, 1992 and subse-

---

**1.** These eight voters included those whose signed in at the March 10, 1992 Republican primary but testified that they had not actually cast ballots and those who voted in the Democratic primary runoff election but did not vote for either Reyes or Green.

quently signed-in to vote in the Democratic Primary Run-off election on April 14, 1992. See Plaintiff's Exhibits 1a–1f; Testimony of Barbara Duganier of Arthur Andersen & Co.

4. Additional evidence indicates that the correct number of individuals that apparently voted in both the Republican primary and the Democratic run-off was 429. Of these, approximately 97.5% (418) probably voted in the Green/Reyes race in the multi-race run-off election, because that percent of all run-off voters cast a vote for one candidate or the other in the Green/Reyes race.

5. During eight days of the trial, Reyes caused subpoenas to be issued for 292 of the 429 identified "crossover" voters. Of those 292 voters, 246 voters actually appeared to give evidence either in person (212) or through telephone depositions (34) supervised by the court. The number who testified by deposition were permitted to do so because of disabilities or circumstances that materially impaired their ability to come to the courthouse. The remaining individuals fell into several different categories: crossover voters that were subpoenaed but failed to appear; crossover voters that resisted service; crossover voters that evidence showed had moved and could not be located; and others that neither party chose to subpoena. Reyes also tendered into evidence affidavits from eight crossover voters. The affidavits were admitted into evidence as statements against interest. TEX.R.CIV.EVID. 803(24).

6. Following presentation of the Contestant's witnesses, the Contestee presented 59 voter witnesses in court over a two day period.

7. At the close of evidence, the court had heard evidence concerning the voting conduct of 313 alleged crossover voters. Of those 313 voters, the court finds that they included 220 illegal votes for Green, 75 illegal votes for Reyes, 10 illegal voters who could not remember how they voted or if they voted in the race in questions, and 8 votes that were not illegal. These findings must be viewed with caution since many of the voters who disclosed their vote did so with qualifications such as "I think" or "I probably."

8. The voting conduct of 126 of the identified crossover voters could not be ascertained for reasons such as failed memory (the 10 described in FOF 7), failure to appear pursuant to subpoena, obstacles to service, or for other reasons were not called to testify.

9. Subtracting the ascertainable illegal votes (See FOF 7) from the candidates' total votes would produce a 41–vote margin of victory for Green.[1] This margin, however, based only on a subset of the entire apparent illegal voter population, cannot provide the degree of certainty necessary for this court to declare the true outcome of the election. The number of unascertained votes is greater than three times the margin of victory established by the sample of voters whose voting conduct was determinable by the court. These unascertained votes must be considered by the court in making its judgment. TEX.ELEC. CODE ANN. § 221.011 (Vernon's 1986).

10. The court finds that there was no reliable way of determining how the 126 unascertained votes should be considered to further adjust the votes for each candidate. Contestant's expert witness on the probable tendencies of the crossover voters concluded that the crossover voters as a group were likely to be Green voters. Contestee's expert witness concluded that the voters that did not testify were predominantly Hispanics, and likely to favor Reyes. Applying mathematical projections to the 313 voters whose conduct and memory had been revealed at trial, would produce a victory for Reyes, that is, 70.28% illegal Green votes (220 of 313) × 429 = 302 to be deducted from Green; 23.96% illegal Reyes votes (75 of 313) × 429 = 103 to be deducted from Reyes; yielding a Reyes victory by 13; using the sum of 418 that probably voted in this race (See FOF 4) these projections would give Reyes a victory by 8. Taken as a whole, this evidence is too unreliable to ascertain the *true* outcome.

11. It is highly unlikely that the 116 voters who did not give direct evidence of their conduct could all be produced in court

or located to give testimony by deposition or affidavit, even with a protracted trial.

12. The true outcome of the April 14 run-off election cannot be ascertained, and the number of illegal votes is greater than the number necessary to change the outcome.

### B. Conclusions of Law

The Election Code voids any ballot cast in a Democratic primary run-off election from someone who had previously participated in the Republican primary in that election year. Texas Election Code § 162.-013.

2. Texas Election Code § 221.012(b) mandates that an election tribunal *"shall* declare the election void if it cannot ascertain the true outcome of the election." (emphasis added.) Moreover, the court may reach this result "without attempting to determine how individual voters voted" so long as "the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election." Texas Election Code § 221.-009(b).

3. Section 221.009(b) must be interpreted and applied in a manner that makes sense. It clearly must mean that an election tribunal in its discretion may order a new election when, as here, the number of illegal votes exceeded the official margin of victory by more than two to one without either requiring testimony from each illegal voter, or proof by the Contestant that collecting such testimony represented a physical impossibility. The statute must envision the circumstance in which the magnitude of the illegal voting along with some evidence of the tendencies of the illegal voting warrant the relief of a new election without the laborious, lengthy, and expensive process of a single trial judge trying to call a close election weeks or months afterwards by the testimony of hundreds of voters with uncertain memories.

4. Plainly-worded statutes must be read in their common sense. Section 221.009(b) must mean that in some reasonable circumstances the presumption of correctness of

the official outcome no longer prevents relief in the form of a new election.

5. Section 221.011 requires the court to deduct illegal votes from the candidates receiving them, but when it "cannot ascertain how the [illegal] voters voted, the tribunal shall consider those votes in making its judgment." The law assumes that in some cases, as here, some illegal votes will remain in doubt after all the evidence is concluded in an election contest, and further mandates that the court take those illegal but unknown votes into account.

6. When the court, with some degree of certainty, can determine the outcome of the election based upon the evidence presented by the parties, section 212.012(a) requires it to do so. Failing this, the court's only alternative is defined by § 221.012(b), which requires the voiding of the election. Whatever may be the case when Contestant fails to sustain its burden of proof concerning the number of illegal voters, or proves a number of illegal voters less than the margin in the official returns for the election, once a Contestant has satisfied its burden of proving the number of illegal voters necessary to trigger the powers of the court under § 221.009(b), § 221.012(b) cannot be read to require a Contestant to prove the unavailability or lack of memory on the part of each and every voter whose vote might make a difference in order for the court to declare a new election. Such a burden would make some election contests logistically impossible.

7. An application, of sections 221.009 and 221.012 in this fashion carefully balances two competing public policies which clash when illegal voting exceeds the margin of "victory" by some magnitude: the policy of promptly determining election results versus the policy of maintaining public confidence in the integrity of an election process that is free from taint.

[1]The adjusted final canvas referred to in the second Finding of Fact would be adjusted by the illegal votes as follows: Green's total vote count would become 15,638 votes (15,858 minus 220 illegal votes) and Reyes's total vote count would become 15,597 votes (15,672 minus 75

illegal votes), yielding the 41–vote margin of victory.

Based upon these Findings of Fact and Conclusions of Law, the trial court reasoned that the election should be declared void and a new election ordered pursuant to TEX.ELEC.CODE ANN. § 221.009(b) (Vernon 1986).

■■■ In points of error one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, and fifteen, the appellant asserts that the trial court's judgment ordering a new election has impermissibly lessened the burden of proof which is placed upon election contestants. "The burden of proving illegality in an election contest is on the contestant who must prove that illegal votes were cast in the election being contested and that a different and correct result would have been reached by not counting the illegal votes." *See, e.g., Chumney v. Craig*, 805 S.W.2d 864, 870 (Tex.App.—Waco 1991, writ denied). *See also Medrano v. Gleinser*, 769 S.W.2d 687, 688 (Tex.App.—Corpus Christi 1989, no writ); *Miller v. Hill*, 698 S.W.2d 372, 375 (Tex.App.—Houston [14th Dist.] 1985, writ dism'd 714 S.W.2d 313 (Tex.1986)); *Wright v. Board of Trustees of Tatum Ind. Sch. Dist.*, 520 S.W.2d 787, 790 (Tex.Civ.App.—Tyler 1975, writ dism'd w.o.j.); *Grizzaffi v. Lee*, 517 S.W.2d 885, 892 (Tex.Civ.App.—Fort Worth 1974, writ dism'd w.o.j.). Nevertheless, the standard of review to be placed on an appeal from a judgment in an election contest is whether from the record it appears that the trial court abused its discretion. *See, e.g., Miller*, 698 S.W.2d at 375; *Goodman v. Wise*, 620 S.W.2d 857, 859 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). *See generally*, TEX.JUR. III, *Elections* § 185 (1984).

In this instance, appellant brought an election contest under the Texas Election Code on the basis that illegal votes were improperly counted in the final election canvass. TEX.ELEC.CODE ANN. § 221.003(a)(1) (Vernon 1986). In particular, appellant alleged that a large number of voters had registered and voted in both the Republican party primary and the Democratic primary runoff election. Section 221.003 of the Texas Election Code allows for an election contest to be brought where it appears that the final election canvass is not the true outcome of the election due to the casting of illegal votes.[2] *See* TEX.ELEC. CODE ANN. § 221.003(a)(1) (Vernon 1986). An illegal vote occurs where a registered voter actually casts a ballot in both the Republican and Democratic primaries.[3] *See* TEX.ELEC.CODE ANN. § 221.003(b) (Vernon 1986).

In order to determine the true outcome of the election, the trial court heard testimony from 313 illegal voters during the course of the eleven day trial. Section 221.009 grants the district court the power to compel a voter to reveal his or her vote by providing that:

(a) A voter who cast an illegal vote may be compelled, after the illegality has been established to the satisfaction of the tribunal hearing the contest, to disclose the name of the candidate for whom he voted or how he voted on a measure if the issue is relevant to the election contest.

TEX.ELEC.CODE ANN. § 221.009(a) (Vernon 1986). Both appellant and appellee were able to secure the testimony of 313 of the 429 illegal voters; of these, 220 illegal voters admitted voting for Green and 75 admitted voting for Reyes.

■■■ Pursuant to the Election Code, the trial court subtracted the number of ascertainable illegal votes from the candidates' total votes.[4] *See* TEX.ELEC.CODE ANN.

---

**2.** TEX.ELEC.CODE ANN. § 221.003(a)(1) (Vernon 1986). Section 221.003(a)(1) provides in relevant part that:
(a) The tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because:
(1) illegal votes were counted....
*Id.*

**3.** TEX.ELEC.CODE ANN. § 221.003(b) (Vernon 1986). Subsection states that:
In this title, "illegal vote" means a vote that is not legally countable.
*Id.*

**4.** TEX.ELEC.CODE ANN. § 221.011(a). Section 221.011(a) mandates that:

§ 221.011(a) & 221.012(b) (Vernon 1986). *See also* Tex.Elec.Code Ann. § 221.012(a) (Vernon 1986). In this instance, once the illegal votes were subtracted from the original election results, the canvass yielded a 41 vote margin of victory for Green. Notwithstanding, the trial court also found that 126 illegal votes were not able to be ascertained. Therefore, the 41 vote margin of victory in favor of Green could not accurately reflect the true outcome of the election. In response, the trial court entertained testimony from expert witnesses on behalf of appellant and appellee who testified that statistically the majority of the 126 unascertained illegal votes would have been cast for their opponent. Disregarding this conflicting testimony, the trial court determined that the true outcome was unable to be determined. Therefore, pursuant to section 221.012(b), the trial court held the election void and ordered a new election because the margin of victory, 41, was far surpassed by the number of unascertained illegal votes, 126. *See* Tex.Elec. Code Ann. § 221.012(b) (Vernon 1986). Section 221.011(b) states that:

> If the tribunal finds that illegal votes were cast but cannot ascertain how the voters voted, the tribunal *shall* consider those votes in making its judgment.

Tex.Elec.Code Ann. § 221.011(b) (Vernon 1986) (*emphasis added*). Therefore, the trial court properly considered the 126 unascertained illegal votes in making the determination that the true outcome of the election was uncertain. *Id.*

■ In addition, section 221.009(b) grants the district court the discretion to void the election results and order a new election be held:

> If the tribunal hearing an election contest can ascertain the candidate or side of a measure for which an illegal vote was cast, the tribunal shall subtract the vote from the official total for the candidate or side of the measure, as applicable.
> *Id.* If the true victor of the election can be ascertained, the trial court shall declare the winner. Tex.Elec.Code Ann. § 221.012(a) (Vernon 1986). Section 221.012(a) explains that:
> If the tribunal hearing an election contest can ascertain the true outcome of the election, the tribunal shall declare the outcome.

If the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election, *the tribunal may declare the election void without attempting to determine how individual voters voted.*

Tex.Elec.Code Ann. § 221.009(b) (Vernon 1986) (*emphasis added*). Pursuant to this section, an election tribunal may void the election and order that a new election be held *without* ever attempting to ascertain for whom illegal voters had cast their ballots. *Id.* Nevertheless, the overriding policy which guides an election contest is to determine "the true outcome of the election." Tex.Elec.Code Ann. § 221.003(a)(1) (Vernon 1986). Out of deference to this policy, the trial court *chose* to entertain the testimony of 313 of the 429 illegal voters in attempt to determine if the true outcome could be ascertained. Finally, the court concluded that "[t]his [41 vote] margin [of victory for Green], however, based only on a subset of the entire apparent illegal voter population, cannot provide the degree of certainty necessary for this court to declare the true outcome of the election." Therefore, the trial court declared the election void pursuant to its discretion under sections 221.009(b) and 221.012(b) because the number of unascertained illegal votes was greater than the margin of victory. Tex.Elec.Code Ann. § 221.009(b) & 221.- 012(b) (Vernon 1986).

Appellant contends that the trial court's ruling is in error because the court read 221.009(b) in isolation from the other provisions of the election code. However, our sister court in Corpus Christi has upheld a similar trial court judgment in an election contest. *See Medrano*, 769 S.W.2d at 688– 89. In *Medrano*, it was held proper for the

Tex.Elec.Code Ann. § 221.012(a) (Vernon 1986). However, where the number of illegal unascertained votes is greater than or equal to the margin of victory, the trial court shall declare the election canvass void and order a new election. Tex.Elec.Code Ann. § 221.012(b) (Vernon 1986). Section 221.012(b) mandates that:
> The tribunal shall declare the election void if it cannot ascertain the true outcome of the election.
*Id.*

trial court to void the election results and order a new election where some but *not all* of the illegal votes were able to be attributed to and deducted from the candidates' final election canvass. *Id.* The court of appeals heard an appeal in which appellant lost the election by a single vote. *Id.* at 688. The evidence presented at trial demonstrated that six illegal votes were cast. *Id.* The trial court heard testimony from each of the six persons who cast illegal votes and each stated for whom he or she had voted; however, the trial court chose not to believe the sixth voter's statements because the voter had a prior felony conviction. *Id.* at 688–89. Therefore, the vote was equally divided and the trial court held the election results void. *Id.* at 689–90.

The court of appeals determined that the proper procedure under the election code was to first compel the illegal voters to reveal how they voted. *Id.* at 688. *See also* TEX.ELEC.CODE ANN. § 221.009 (Vernon 1986). Secondly, the court must subtract those votes it can attribute as being cast for a specific candidate from the final election canvass. *See Medrano*, 769 S.W.2d at 688. *See also* TEX.ELEC.CODE ANN. § 221.-011 (Vernon 1986). If this tally yields a clear winner, the trial court shall declare the election result. TEX.ELEC.CODE ANN. § 221.012(a) (Vernon 1986). However, the trial court "shall declare the election void" if the margin of victory is less than or equal to the number of undetermined illegal votes after subtracting all of the illegal votes that may be positively attributed to the candidates.[5] *See Medrano*, 769 S.W.2d at 688. *See also* TEX.ELEC.CODE

ANN. § 221.009(b) & 221.012 (Vernon 1986). The court of appeals ruled that the trial court may properly void the election results where it is unable to ascertain for whom all illegal votes were cast and without such the number of undetermined illegal votes is greater than or equal to the margin of victory.[6] *See Medrano*, 769 S.W.2d at 690. Likewise, the trial court in this instance found that the number of illegal unascertained votes was in excess of the margin of victory.[7]

■ Appellant argues that under the trial court's ruling "any close election can be voided because the existence of some illegal votes taints the election and public policy requires that a new election is required to correct this taint;" however, the policy behind section 221.012(b) of the Election Code is not about how close the final election results may be but rather, that section merely seeks to insure that the final election canvass is a clear reflection of the *legal* votes *cast. See Medrano*, 769 S.W.2d at 688. Section 221.012(b) is not a tool to be utilized to void the election results of a close election. Rather, section 221.012(b) only comes into play where there were illegal votes cast which upon reasonable inquiry at an election contest cannot be attributed to either the contestant or contestee. *See* TEX.ELEC.CODE ANN. § 221.-012(a) & (b) (Vernon 1986). *See also Medrano*, 769 S.W.2d at 688. The trial court may void the election results and order that a new election be held where there is a sufficient number of illegal votes which cannot be attributed to either candidate,

---

5. *See also Kelley v. Scott*, 733 S.W.2d 312, 314 (Tex.App.—El Paso 1987, writ dism'd w.o.j.). In that instance, the appellee had won the election by only one vote. *Id.* However, the election tribunal found that one absentee ballot had been illegally counted. *Id.* The court held that: TEX.ELEC.CODE ANN. sec. 221.009(b) (Vernon 1986) provides that if the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election, the tribunal may declare the election void without attempting to determine how the individual voters involved voted. Since one vote can change the outcome of the election in question, it was not necessary to show how [the illegal voter] cast her vote.

*Id.*

6. *See also Kelley*, 733 S.W.2d at 314; *Wright*, 520 S.W.2d at 793; *White v. Hearne*, 514 S.W.2d 765, 767 (Tex.Civ.App.—Waco 1974, no writ); *Ware v. Crystal City Ind. Sch. Dist.*, 489 S.W.2d 190, 191–92 (Tex.Civ.App.—San Antonio 1972, writ dism'd w.o.j.).

7. The trial court's Finding of Fact number twelve states that "The true outcome of the April 14 run-off election cannot be ascertained, and the number of illegal votes is greater than the number necessary to change the outcome."

namely, where the number of illegal unascertainable votes is greater than or equal to the margin of victory. Tex.Elec.Code Ann. § 221.012(b) (Vernon 1986). *See also Medrano,* 769 S.W.2d at 688.

■ Appellant further argues that under the approach taken by the trial court, "whoever loses, may return to court, prove that the number of illegal voters is equal to or greater than the difference in the margin in the election and the contestant is *entitled* to a new election." (*emphasis added*). Once again, appellant misconstrues the Election Code. Sections 221.009 and 221.012 vest discretion in the trial court to determine whether or not the true results of the election can be ascertained. Tex.Elec.Code Ann. § 221.009 & 221.012 (Vernon 1986). "The tribunal shall declare the election void if it cannot ascertain the true outcome of the election." Tex.Elec. Code Ann. § 221.012(b) (Vernon 1986).

In this instance, the trial court found that the true results of the April 14, 1992 primary runoff could not be ascertained. The evidence presented at trial attributed 220 of the illegal votes to Green, 75 to Reyes, 8 were not illegal, and 126 were unable to be attributed to either side. We find that the trial court did not impermissibly alter the burden of proof in an election contest and further find that the trial court properly held the election void because the true outcome could not be ascertained. Appellant's points of error one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, and fifteen are overruled.

■ Further, in points of error sixteen, seventeen and eighteen, appellant argues that the evidence is insufficient to support the trial court's Findings of Fact. Appellant first alleges insufficient evidence to support the Finding that:

the correct number of individuals that apparently voted in both the Republican primary and the Democratic run-off was 429. Of these, approximately 97.5% (418) probably voted in the Green/Reyes race in the multi-race run-off election, because that percent of all run-off voters cast a vote for one candidate or the other in the Green/Reyes race.

Appellant attributes this finding to the testimony of Mr. Kent Tedin who stated that of the voters who cast ballots in both the Republican primary election and the Democratic runoff election, 97.5% or 418 voters probably voted in the Green/Reyes runoff. In non-jury cases in which both Findings of Fact and a Statement of Facts have been filed, we must review the sufficiency of the evidence under the same standards utilized for jury tried cases. *See, e.g., McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex. 1987); *Gill Savings Ass'n v. Chair King, Inc.,* 783 S.W.2d 674, 676–77 (Tex.App.—Houston [14th Dist.] 1989), *aff'd in part on other grounds,* 797 S.W.2d 31 (1990). In reviewing the sufficiency of the evidence, we must review all of the evidence in support of the findings of the trier of fact. *See, e.g., Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). This court will reverse only if the evidence in support of the finding is so weak as to render the outcome manifestly unjust or clearly wrong. *See, e.g., In re Kings Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

■ Appellee called Mr. Tedin to testify based upon his experience as a professor of political science and Chairman of the Political Science Department at the University of Houston. After stating for the record his academic credentials, Mr. Tedin testified that about 97.5% of the voters who voted in the runoff election voted on the Green/Reyes issue.

We know that approximately two and a half percent of the voters engaged in what we call, in academic political science, roll off, meaning they did not vote in a particular election. There is absolutely no reason to think that two and a half percent that characterized the entire Congressional District would have been anything other than characteristic of the 430 Republicans. That is, I would expect that you would probably find roll off of maybe two, two and a half percent, although this is a typically motivated group of people and it might even be less because in a very, very low turnout runoff, these people voted twice.

In addition, Mr. Tedin stated that there was "no independent factually incontrovertible way of determining who a person really voted for." Although the Findings of Fact in a judge-tried case are not conclusive when a complete statement of facts appears in the record, great deference must be given to the judge's determination of the witnesses' credibility and the weight to be given to their testimony. *See, e.g., Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.App.—Houston [14th Dist.] 1985), *writ ref'd n.r.e. per curiam*, 699 S.W.2d 199 (Tex.1985). We find Mr. Tedin's testimony sufficient to support the Finding that "approximately 97.5% (418) [illegal voters] probably voted in the Green/Reyes race...."

■ In addition, appellant argues that there is insufficient evidence to support the judge's Finding that the remaining 116 unascertained votes were indeed illegal. The final number of unascertained votes included both the 116 illegal voters from whom no statement or testimony was procured as well as the 10 illegal voters who stated that they could not remember for whom they had voted. Nevertheless, Ms. Barbara Duganier of the Arthur Andersen Company testified that she reviewed the lists for both the Republican primary election and the Democratic runoff to compile a list of those voters who had illegally voted. The list was compiled through a comparison of voter names, voter registration numbers and precinct numbers. Further, she confirmed that another employee of the Arthur Andersen Company had compared the signatures of the voters as an added measure to determine whether it was indeed the same voter who voted in both elections. On cross-examination, Ms. Duganier admitted that neither she nor the other employee were experts in handwriting analysis and therefore she could not testify as an expert. On this basis, appellant contends that there was insufficient evidence to show that there were indeed another 116 illegal voters. Once again, we note that great deference must be given to the judge's determination of the witnesses' credibility and the weight of their testimony. *See Middleton*, 687 S.W.2d at 44. We will reverse only where the record shows that the judge's Findings are so weak as to render the outcome manifestly unjust or clearly wrong. *See In re Kings Estate*, 150 Tex. at 664–65, 244 S.W.2d at 661. Further, the Rules of Evidence and prior caselaw clearly state that signatures may be properly authenticated where the trier of fact has an opportunity to compare the signatures to determine their genuineness.[8] *See* TEX.R.CIV.EVID. 901(b)(2) & (b)(3). *See also In re Estate of Watson*, 720 S.W.2d 806, 808 (Tex.1986); *Strong v. State*, 805 S.W.2d 478, 486 (Tex.App.—Tyler 1990, pet. ref'd). We find the trial court's conclusion of genuineness and Ms. Duganier's comparison based upon voter names, voter registration numbers and precinct numbers are sufficient evidence to support the trial court's Finding that an additional 116 illegal votes existed.

■ Further, appellant complains that Findings of Fact numbers five and eight are erroneous because the trial court simply "generalize[d]" the reasons why the testimony of the remaining 116 illegal voters was not procured. The court stated that:

The remaining individuals fell into several different categories: crossover voters that were subpoenaed but failed to ap-

---

**8.** In addition, we note that nonexpert comparison of voters' signatures is clearly sanctioned under the Election Code. TEX.ELEC.CODE ANN. § 87.027(e) (Vernon Supp.1992). Indeed, no expertise is needed in order to serve on a Signature Verification Committee; rather:

To be eligible to serve on a signature verification committee, a person must be a qualified voter:

(1) of the county, in a countywide election ordered by the governor or a county authority in a primary election;

(2) of the part of the county in which the election is held, for an election ordered by the governor or a county authority that does not cover the entire county of the person's residence; or

(3) of the political subdivision, in an election ordered by an authority of a political subdivision other than a county.

*Id.*

pear; crossover voters that resisted service; crossover voters that evidence showed had moved and could not be located; and others that neither party chose to subpoena.

Appellant surmises that "[t]his is an euphemism for the voters that Reyes did not want to produce." Interestingly, appellant's own brief admits that there were some 27 voters who were subpoenaed but failed to appear and that some others resisted service. Moreover, witnesses for both sides testified that difficulties arose in serving some of the people for whom subpoenas were issued.

Furthermore, appellant states that the trial court's Finding number seven unfairly "accepted as true the testimony of every voter witness who testified as to how they voted.... [but] attempts to introduce some uncertainty into this process by stating that '[m]any of the voters who disclosed their vote did so with qualifications such as "I think" or "I probably".'" Although appellant argues that the court's statement about the lack of decisiveness was unsupported by the record, appellant himself admits that "a few were uncertain as to their vote." A thorough review of the record clearly demonstrates that some voters' testimony was not procured because of failure to appear, resistance to service or inability to locate. Additionally, the record reflects that some illegal voters refused to disclose for whom they had voted and even more disclosed who they had voted for with some qualifications such as those noted by the trial court. Therefore, we find sufficient evidence to support the trial court's Findings and overrule appellant's points of error sixteen, seventeen and eighteen.

 Finally, in his thirteenth and fourteenth points of error, appellant asserts that the trial court erred by allowing affidavits of illegal voters to be admitted into evidence and by allowing thirty-five voters to testify over the telephone. While appellant raises these issues as points of error at the beginning of his brief, he does not specifically address them. The Texas Rules of Appellate Procedure require that argument and authority must be brought forth in support of each point of error for such error to be properly before the court on appeal. TEX.R.APP.P. 74(f). Regardless of appellant's failure to do so, affidavits of persons who thereby admit under oath an action which can subject them to criminal liability may be properly admitted at trial as an exception to the hearsay rule as statements against their interest.[9] *See* TEX.R.CIV.EVID. 803(24) (Pamph.1992). Further, telephone depositions of witnesses are allowed under the Texas Rules of Civil Procedure.[10] *See* TEX.R.CIV.P. 202(2)

---

9. TEX.R.CIV.EVID. 803(24) (Pamph.1992). Rule 803(24) is an exception to the hearsay rule and states as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (24) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
> *Id.*

10. TEX.R.CIV.P. 202(2) (Pamph.1992). "The parties may stipulate in writing, or the court may upon motion order, that a deposition be taken by telephone...." *Id. See also Clone Compo-*

*nent Dist. v. State,* 819 S.W.2d 593, 597–600 (Tex.App.—Dallas 1991, no writ). In *Clone,* appellant challenged the validity of telephone depositions where the court reporter was not physically in the same room as the deponent but rather was in the same location as the interrogator. *Id.* at 597. It was appellant's contention that these circumstances made it impossible for the reporter to know whether the deponent was truly placed under the oath. *Id.* The court ruled that "[t]o require the State to hire a separate court reporter for each witness in order that the reporter can be in the physical presence of the deponent when a single reporter could adequately record all of the depositions over the telephone without harm to the rights of appellants would not be in accordance with our duty to interpret the Rules of Civil Procedure liberally 'to obtain a just, fair, equitable and impartial adjudication of the rights of the litigants under established principles of substantive law ... with as great expedition and dispatch and at the least expense ... to the litigants ... as may be practicable.' TEX.R.CIV.P. 1." *Id.* at 598. "No-

**214**

(Pamph.1992). Therefore, appellant's thirteenth and fourteenth points of error are overruled.

This court will not entertain any motions for rehearing pursuant to TEX.ELEC.CODE ANN. § 232.014(e) (Vernon 1986).[11]

Having found no merit in any of appellant's eighteen points of error and finding no abuse of discretion by the trial court, the judgment of the trial court is affirmed. The Clerk of the Court is directed to issue the mandate of the Court immediately.

where do the Rules of Civil Procedure require that the deponent be physically present before the court reporter either for being sworn or for the recording of the testimony." *Id.* We agree.

**11.** TEX.ELEC.CODE ANN. § 232.014(e) (Vernon 1986). Section 232.014(e) vests the discretion to refuse to grant motions for rehearing in appeals from election contests as follows:

> The court of appeals may refuse to permit a motion for rehearing to be filed or may reduce the time for filing the motion.

*Id.* Further,

> [t]he decision of the court of appeals is not reviewable by the supreme court by certified question or any other method.

TEX.ELEC.CODE ANN. § 232.014(f) (Vernon 1986).