**Opinion issued February 3, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00921-CV**

———————————

**ERIN ELIZABETH LUNCEFORD, Appellant**

**V.**

**TAMIKA CRAFT, Appellee**

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-79328**

## CONCURRING OPINION

Harris County's administration of the 2022 general election was not the pinnacle of excellence. Some polling places opened late, which led a court to order they all stay open late. Some didn't have enough ballots. Thousands of people, upon

being told of delays due to these problems, left polling places and may have given up on voting altogether.

And those were just the problems apparent on election day. Subsequent litigation showed well over a thousand individuals were allowed to vote despite either not completing statutorily required forms or filling out residence forms in a manner not consistent with being a Harris County resident.

Were the election a blowout, this may have gone unnoticed. But it was close. Out of 1,107,390 votes cast, two countywide elections were decided by fewer than a thousand votes, and five other races were decided by fewer than five thousand.

Twenty-one losing candidates filed election challenges. These cases were assigned to the same visiting judge, the Honorable David Peeples. Judge Peeples granted summary judgment for the contestees in fifteen cases, four contestants dismissed their cases after discovery, and two cases went to bench trials.

Both of those trials—this case, and *Jones v. Pierce*—were appealed and I was on the panel for both.[1] I join the opinion of the court today because I believe Judge

---

[1] In *Jones v. Pierce*, No. 01-24-00377-CV, the margin of victory in that case was 449 votes. Based on evidence that significantly overlapped with the evidence here, Judge Peeples found the true winner of the election could not be determined and ordered a new election. While the appeal was pending the contestee/appellant resigned his bench and dismissed the appeal, leaving the trial court's judgment in place. As best I can tell, in terms of votes cast that is the largest election ever overturned in Texas history.

There were a variety of legal issues on appeal in *Jones*, and nothing I say here is a comment on the proper result of that case. I use the publicly-available information

2

Peeples was within the bounds of his discretion to conclude that Craft's margin of victory was too large to be undermined by the number of votes Lunceford proved were affected by the various election administration mistakes.

With that said, having reviewed the records and arguments for both cases I have noticed ways in which current Texas law makes election challenges from large jurisdictions difficult, or perhaps impossible. Some of these are beyond the control of the courts—it seemed awfully hard for the contestants to get basic information from the county to verify its election results, such as 1) voter rolls for who was a registered voter on election day, 2) an accurate list of who voted, 3) cancellation and suspense lists that were accurate on election day—so I won't dwell on them.

But one issue falls squarely upon the judiciary: What type of proof suffices to prove a voter who cast a ballot actually voted in a particular down-ballot election? To overturn an election Texas law requires not just that illegal ballots were cast, but that illegal votes were cast in the specific race being contested. In previous cases, contestants met this burden through testimony by the voters, but the numbers here make that practically impossible. In future big-jurisdiction cases, I think courts should be open to the sort of general statistical reasoning Judge Peeples found persuasive in this case.

---

and arguments from *Jones* simply as a data point of a case that had some, but not complete, factual overlap with this case on the single issue I address here.

## I.    Size Comparisons

With over a million votes, this case is the largest election contest in Texas appellate law, and it's not remotely close. The next largest I can find involved roughly 4% as many votes. *See Miller v. Hill*, 698 S.W.2d 372 (Tex. App.—Houston [14th Dist.] 1985), *pet. dism'd*, 714 S.W.2d 313 (Tex. 1986). Indeed, Texas election cases typically involve small numbers of votes in small elections. *See, e.g.*, *Medlin v. King*, 705 S.W.3d 267, 278 (Tex. App.—El Paso 2024, pet. denied) (litigating residency of 26 Loving County voters for election with around 80 total votes); *Woods v. Legg*, 363 S.W.3d 710, 712 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (litigating residency of voters for Galveston city council runoff where winner got 209 votes and loser 200).

The large number of votes here obscures how small the margin actually is. For instance, in *Rodriguez v. Rangel*, 679 S.W.3d 890 (Tex. App.—San Antonio 2023, pet. denied), the contest concerned a 7-vote margin in an election where 3,907 ballots were cast. A 7-vote margin sounds a lot smaller than the 2,743 margin here or the 449 margin in *Jones*, but as a percentage of votes cast the 7 votes in *Rodriguez* is 0.18%, which is only slightly smaller than the 0.26% margin here, and considerably larger than the 0.04% margin in *Jones*.

I point this out to dispel any notion that the litigants here and in *Jones* challenged an extraordinarily high portion of voters. It is simply the case that any

election challenge in a large Texas jurisdiction is going to involve a challenge to thousands of votes. The judiciary must be able to resolve a claim like that in a fair and practical manner.

## II.  Evidence Large and Small

In election cases with few votes it's not a huge burden to put on live witnesses. While having twenty-six challenged voters testify in *Medlin* was likely a big to-do in Loving County, that number of witnesses falls within ordinary parameters for a trial.

But testimony from the thousands of challenged voters here and in *Jones* does not. And neither Lunceford nor Pierce attempted to produce such testimony. Instead, they attacked the lawfulness of large categories of ballots, including ballots supported by improper documentation and ballots cast after hours, among others.

With those sorts of claims, with these sorts of numbers, how should a court determine which of the challenged voters actually voted in the relevant election? Lunceford and Pierce argued the court should simply apply the undervote percentage for the overall election to the challenged number of votes. In this case, 96.14% of all ballots cast included a vote for the 189th District Court, so take the number of people who voted illegally, multiply it by 0.9614, and that's the number of illegal votes in this election.

Judge Peeples called this approach "reasonable," and he followed it both here and in *Jones*. In both cases the contestees challenged this method, claiming the lack of testimony from individual voters left this evidence insufficient.

### III.    The Alternative to Statistical Reasoning

The contestees' observation that all previous case law involves individual testimony is true, as far as it goes. Although Judge Peeples's approach is novel, I think it was a reasonable adaptation to the numbers involved in a Harris County election contest. Requiring contestants to put on thousands of witnesses to challenge even the slimmest election loss would make election challenges insurmountable in large jurisdictions.

Judge Peeples's approach was appropriate for the facts of these cases. First, it's important to remember the contestants were not seeking to be declared the winner, which is what many election contestants seek. Here, the contestants' requested relief was for the trial court to order a new election because it could not "ascertain the true outcome of the election." TEX. ELEC. CODE § 221.012(b). This standard, on its face, embraces a fair amount of ambiguity.

Second, as the size of a sample goes up, the more likely it is to reflect the whole. Had Judge Peeples found one ballot illegal, it would not have been reasonable to infer whether that ballot undervoted a particular election. Had he found ten ballots illegal, it still would have been unreasonable to infer much. But as the sample size

increases so does the reasonableness of inferring that it reflects the whole. With the sample sizes Judge Peeples was dealing with—in *Jones* it was 1,483 affected votes, here it was 2,891—in the absence of arguments or evidence to the contrary it would be reasonable to infer these voters behaved more or less like the other voters.

Third, individual testimony in cases like this has its own problems. This is shown by *Green v. Reyes*, 836 S.W.2d 203 (Tex. App.—Houston [14th Dist.] 1992, no writ). *Green* involved a multi-race Democratic primary runoff election. There were 32,338 total ballots cast, with 31,530 votes in Green's race; Green won the original count by 186 votes.[2]

The evidence showed 429 voters illegally voted in the Democratic runoff after voting in the Republican primary. *Id.* The question before the trial court was to determine how many of those voters voted in Green's race, and, if possible, for whom did they vote?

*Green* says that 313 of the challenged voters—0.97% of total voters—testified (by live testimony, deposition, affidavit, or phone testimony) in an 11-day trial. Two things stand out from this number. First, even with a concerted effort just a few weeks after the election, only about three quarters of the challenged voters could be

---

[2]     *Green* has one of the largest vote totals of any Texas election challenge, and it is the largest election where an appellate court has upheld a trial court's decision to overturn the results. The 186-vote margin there is much smaller in absolute terms than the margin here, but as a percentage of the vote it's more than twice the margin: 0.59% there compared to 0.26% here.

found. The trial court found it was "highly unlikely" that evidence could be obtained from the other 116 "even with a protracted trial." *Id.* at 206-07. If an election contestant is obliged to put on witness testimony, but a quarter of challenged voters will be unreachable, that's a severe hindrance to large-jurisdiction election challenges. And, intuitively, one would reckon the less legitimate the voter, the less likely he or she is to respond conscientiously to service.

The second thing that stands out is that 313 witnesses in 11 days is a remarkable pace, but it's still insufficient for the numbers at issue in a large jurisdiction election challenge. Had the trial court here heard testimony from 0.97% of the voters—10,718—even at the pace of thirty witnesses per day, five days a week, it would take almost a year and a half just to receive evidence. That would be a stupendous outlay of judicial resources, and the cost to both parties would be a degree of magnitude more than the government salary of the elected office at issue.

And how useful would this testimony be? The trial court in *Green* noted that even though the case was tried within a few weeks of the election the testimony "must be viewed with caution since many of the voters who disclosed their vote did so with qualifications such as 'I think' or 'I probably.'" *Id.* at 206. If the contestant here or in *Jones* called thousands of witnesses to testify months after the election about whether they voted in one of sixty down-ballot judicial races, *any* testimony would need to be, at best, "viewed with caution."

8

And then there's the very obvious point that witnesses would be testifying because they voted illegally or, at least, in a manner that did not demonstrate the highest levels of conscientiousness. If a witness testified she illegally cast a ballot a year earlier and she "thinks" she voted in a particular down-ballot race, I don't know what a factfinder is supposed to do with that.

Multiplying the marginal testimony of a marginal witness by several thousand doesn't create clear and convincing proof of anything. If 10,000 witnesses with obvious credibility problems testified, on appeal any appellate court would defer to the trial court's credibility finding no matter what it was. If 10,000 witnesses testified, "I illegally voted in the election, but I didn't vote in the race for the 189th," or if 10,000 witnesses testified, "I illegally voted in the election, and I definitely voted for the 189th," as long as there were at least 10,000 votes and 10,000 undervotes, any finding by the trial court would be upheld. Thus, a trial court would distill an 18-month trial into whatever result the judge wanted, and that would be that.[3]

---

[3] I'm not implying the result would be whimsical, necessarily. Forcing a judge to make a decision based on overwhelming quantities of incredible testimony is like forcing him to build a house on sand. The only question is which direction it will fall.

## IV.    General Statistical Reasoning is Sufficient

I don't think such an extravagant proceeding is necessary to produce clear and convincing evidence that votes were cast when the number of challenged voters is as large as it is here. *Green* is the only example in the case law of a court calculating the number of illegal votes by multiplying the number of illegally cast ballots by the undervote percentage for the contested race. Judge Peeples relied on *Green* for his decision to use general inductive statistical reasoning here and in *Jones*. In both cases the contestees argued that *Green* required more evidence than what the contestants produced here.

The contestees' basic point was correct: *Green* had more evidence than Judge Peeples required. But under scrutiny it's clear the additional evidence in *Green* was unneeded or ignored.

The contestant in *Green* challenged 429 voters, of whom 313 testified. That left the trial court with the problem of how to account for the other 116 illegal votes. The chair of Rice University's political science department testified about how to calculate the undervote. Both here and in *Jones* the contestees pointed at this expert testimony as distinguishing *Green* from these cases, where there was no such expert testimony.

But the Rice professor's testimony in *Green* is a great example of a highly credentialed individual testifying to common sense. The extent of his testimony on

the undervote was that "[t]here is absolutely no reason to think that [the] two and a half percent [undervote] that characterized the entire [contested race] would have been anything other than characteristic of the [illegal voters]." *Id*. at 211.

In its findings, the trial court in *Green* calculated the undervote by applying the 2.5% undervote to all 429 illegal voters. That is, it disregarded the voters' testimony about whether they voted and instead used statistical reasoning.

The Fourteenth Court upheld this method based on the Rice professor's testimony, but I don't think the professor's testimony added anything of value. A political science professor stating he has no reason to doubt a commonsense inference about undervoting is like the director of the McDonald Observatory testifying he had no reason to believe the daytime sky on a certain date wasn't blue. Calling an expert to testify he has no reason to doubt a commonsense inference is, to the degree it is evidence, an affirmation that the commonsense inference is reasonable. The commonsense inference would have been as reasonable and as strong without the expert's testimony.

The other difference between this case (and *Jones*) and *Green* is that the contestant in *Green* called some, but not all, of the illegal voters, but here (and in *Jones*) the contestant did not call any challenged voters. The argument goes that even if calling thousands of witnesses would be too burdensome, the contestants should have called *some* of the challenged voters.

11

This objection to statistical reasoning fails for at least two reasons. The first is that once we realize any witnesses will have credibility problems and testify something like "I think I did/didn't," it doesn't matter how many there are. Zero, a hundred, and a thousand are all less useful than basic statistical reasoning. That seems to be the conclusion the trial court reached in *Green* when it applied the overall undervote percentage rather than relying on witness testimony.

The second is that taking a convenience sample of a sample doesn't prove whether the original sample was biased. That is, if we're trying to determine whether the 2,891 affected voters in this case behaved like the total population of 1,107,390, getting testimony from, *e.g.*, 289 of the affected voters doesn't answer that question. Instead, it just raises the question of whether *those* 289 were representative of the 2,891.

Rather than sampling a sample, courts can take the original sample for what it is. To be sure, if there was something distinctive about the sample of illegal voters suggesting they were not representative—if they all had the same last name or had addresses in the same precinct—that's the sort of thing that could be pointed out to the trial court as a reason not to make an inference. And contestees are always able to put on witnesses explaining why the sample of illegal voters isn't representative of the whole. But here there was nothing rebutting the commonsense inference that

the challenged voters voted in the contested race at more or less the same rate as voters at large.

### V. Caveats

I'm not advocating a blanket rule for all election contests. If a trial court found there were ten illegal voters and the contested race had an undervote of 50%, you can't infer anything of value from that. What makes this case such a good case for statistical reasoning is 1) the fairly large number of affected votes and 2) the very low undervote percentage. As the number of affected votes gets smaller and the undervote gets larger, inferences becomes less useful. Perhaps more marginal cases would need expert statistical testimony, but Judge Peeples's inferences here were justified based on ordinary reason and common sense.

I will make one suggestion for how inferences could be better. Judge Peeples applied the overall undervote percentage to all affected votes. But we know from the final results that the undervote varied for different types of votes. For instance, in the election challenged here, mail-in ballots had an undervote of 8.3%, early voting ballots had an undervote of 3.2%, and election day ballots had an undervote of 4.4%. Rather than applying the overall undervote percentage to all ballots, it would be better to apply the corresponding percentage to each subset. But this approach would not have created a substantial difference in the final number of affected votes.

## VI.    The Big Picture

No statute or constitutional provision requires that courts use the "clear and convincing" burden of proof for election cases. It's purely a matter of common law, and as such courts should keep an eye to ensuring its application is appropriate.

Anytime the undervote is relevant in an election challenge, it's only because the contestant has already proved the number of illegal ballots exceeds the margin of victory in an election. Without putting too fine a point on it, that's a bad situation. If, in such bad situations, courts use unnecessarily high burdens of proof to make election challenges practically impossible, the public may become skeptical of all election results, and justifiably so. But if the judiciary allows contestants to use general statistical reasoning in large election contests, as Judge Peeples did here, we can render results capable of assuring the public that the true winner won, even if the election administration was not the pinnacle of excellence.


                                        Clint Morgan
                                        Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Morgan.

Morgan, J., concurring.

Publish.